22CA0957 Peo v Vialpando 02-06-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 22CA0957
City and County of Denver District Court No. 21CR3949
Honorable Adam J. Espinosa, Judge

_____

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Areus I. Vialpando,

Defendant-Appellant.

_____

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE YUN
J. Jones and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

_____

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Chelsea A. Carr, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1    Areus I. Vialpando appeals the judgment of conviction entered on jury verdicts finding him guilty of vehicular eluding, first degree aggravated motor vehicle theft, and second degree aggravated motor vehicle theft.  He contends that the district court erred by denying his motion for a mistrial concerning a dismissed juror and by not merging his convictions for aggravated motor vehicle theft.  We vacate his conviction and sentence for second degree aggravated motor vehicle theft and remand the case to the district court with instructions to correct the mittimus.  But we affirm in all other respects.

## I.    Background

¶ 2    Vialpando stole a car that had been left idling outside of a liquor store.  He crashed the car while attempting to elude the police and was thereafter arrested.  The People brought charges, and the case went to trial.

¶ 3    On the second day of the two-day trial, an attorney from the district attorney's office — uninvolved in this case — overheard a juror speaking on the phone in the public restroom.  The attorney informed the prosecutor in this case of what he had heard and identified a juror for Vialpando's trial, Juror H, as the person who

1

had been on the phone. The prosecutor, in turn, brought the matter to the attention of Vialpando's counsel and the court, stating that the substance of the juror's phone conversation was "I will be done tomorrow. This is easy. It's on video, him stealing it."

¶ 4     Vialpando's counsel moved for a mistrial, but the court deferred ruling on the motion until after it spoke with Juror H about the incident. When questioned by the court, Juror H admitted that he had spoken to his cousin while in the restroom and had told her that he was serving as a juror. But Juror H denied expressing any opinion on the case or making the statements that the attorney said he had overheard. He told the court that he had not already decided the outcome of the case before the close of evidence, that he had not spoken to any of the other jurors about the case, and that he could still be a fair and impartial juror.

¶ 5     Vialpando's counsel renewed her request for a mistrial, noting that Juror H's characterization of the phone conversation was at odds with what the attorney had relayed to the prosecutor. And since Juror H had (most likely) lied to the court, Vialpando questioned the veracity of his assertion that he had not spoken with

2

the other jurors about the case. Thus, Vialpando's counsel argued, "I don't think that there's a solution that allows [Juror H] to remain on the jury, but I also don't think there's a solution that . . . allows the jury to remain."

¶ 6      The prosecutor responded by requesting that Juror H be dismissed and replaced by the alternate and suggested that the court individually question the other jurors "to make sure they've followed the [c]ourt['s] orders, they did not speak to [Juror H] about this case, [Juror H] did not speak to them about this case, and so forth." The court agreed with the prosecutor, denied the motion for a mistrial, and excused Juror H from the jury panel.

¶ 7      The court then questioned the jurors one by one, asking them "whether anyone had tried to talk to them, whether anyone contacted them, whether a juror contacted them, whether they spoke to a juror about the case, and whether [Juror H] talked to them about the case." After asking these questions, the court gave both sides the opportunity to ask follow-up questions. Each juror answered "no" to each of the judge's questions, and the attorneys did not ask any questions of their own.

¶ 8     After the court had questioned four of the twelve jurors, the court's law clerk told the parties and the court that, while he was escorting Juror H out of the back hallways behind the jury room, Juror H said that "he did do it." The law clerk clarified that, when Juror H made the statement, nobody was around, the door to the jury room was closed, Juror H was not speaking louder than his normal voice, and it was unlikely that the other jurors heard anything. The parties did not have any follow-up questions for the law clerk, did not request that the court inquire of the jurors whether they had heard Juror H's statement, and did not themselves ask any jurors about the statement.

¶ 9     After the court finished questioning the remaining eight jurors, Vialpando's counsel renewed her request for a mistrial without making any additional record. The court again denied the motion, saying that it was "convinced that [Juror H] has not tried to speak to any of [the remaining] jurors, that he's not reached out to any of these jurors, that no one has reached out to these jurors, nor has anyone tried to speak to these jurors about this case." Accordingly, the court was "convinced the remaining jurors can sit in this case

4

and be fair and impartial, and that there has not . . . been any reason for the case to not continue forward."

¶ 10 The jury found Vialpando guilty of vehicular eluding, first degree aggravated motor vehicle theft, and second degree aggravated motor vehicle theft.

## II. Analysis

¶ 11 Vialpando contends that the district court reversibly erred by (1) denying his attorney's motion for a mistrial based on Juror H's statements and (2) failing to merge his conviction for second degree aggravated motor vehicle theft into his conviction for first degree aggravated motor vehicle theft. We reject his first argument but agree with his second.

### A. Juror H's Statements

¶ 12 Vialpando argues that the district court's attempts to investigate Juror H's statements made in the restroom and while being escorted away from the jury room were insufficient and, therefore, the court abused its discretion by denying his motion for a mistrial. After discussing the standard of review and the appropriate framework for our analysis, we address Juror H's statements in turn.

### 1. Standard of Review and the *Harper* Framework

¶ 13    "A mistrial is a drastic remedy that is warranted only when the prejudice to the accused is so substantial that its effect on the jury cannot be remedied by other means." *People v. Pernell*, 2014 COA 157, ¶ 24 (quoting *People v. Cousins*, 181 P.3d 365, 373 (Colo. App. 2007)), *aff'd on other grounds*, 2018 CO 13.  We review a district court's denial of a motion for a mistrial for an abuse of discretion. *Id.*  A court abuses its discretion when it makes a decision that is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous view of the law. *People v. Van Meter*, 2018 COA 13, ¶ 9.

¶ 14    "A criminal defendant is entitled to have the jury reach a verdict based solely on the evidence presented in the courtroom." *Dunlap v. People*, 173 P.3d 1054, 1091 (Colo. 2007).  Thus, the constitutional right to a fair trial is implicated when a jury is exposed to extraneous information or influences. *Id.*

¶ 15    Both Vialpando and the People suggest that we should apply the objective test set forth in *Wiser v. People*, 732 P.2d 1139, 1142 (Colo. 1987), meaning we would review for "whether there is a reasonable possibility that extraneous information or influence affected the verdict."  But "[t]he reasonable possibility of prejudice

6

test articulated in *Wiser* . . . is not suitable for resolving the effect of [extraneous information or influence] occurring during the trial when the issue of the prejudicial effect of such [information or influence] is presented before completion of the trial." *Harper v. People*, 817 P.2d 77, 83 (Colo. 1991). Since the district court in this case addressed and attempted to investigate the extraneous influence during the trial, we analyze the issue under the test set forth in *Harper*.[1] *See, e.g.*, *People v. Harrison*, 58 P.3d 1103, 1109-10 (Colo. App. 2002) (applying the *Harper* test to a situation involving midtrial contact between the defendant's girlfriend and a juror), *abrogated on other grounds as recognized in Dunlap*, 173 P.3d 1054.

¶ 16    In *Harper*, which involved jurors' exposure to midtrial publicity, the supreme court adopted a "simple three-step process," 817 P.2d at 83 (quoting *United States v. Gaggi*, 811 F.2d 47, 51 (2d

---

[1] We are not bound by the parties' concessions regarding the controlling law. *People v. Snelling*, 2022 COA 116M, ¶ 50 n.3. Instead, we rely on our own interpretation of the law. *Id.*; *see also Lucero v. People*, 2017 CO 49, ¶ 26 (noting that the party presentation principle "does not prevent a court from properly characterizing an issue that has been improperly characterized by a party").

7

Cir. 1987)), that a district court should follow to determine whether midtrial extraneous information or influences prejudiced the defendant's right to a fair trial:

¶ 17 First, the district court must determine whether the extraneous information has a potential for unfair prejudice. *Id.* The court should focus on whether the information is inherently prejudicial and, in doing so, consider whether the information would be admissible at trial, how closely related the information is to the matters at issue in trial, the timing of the exposure, and the likelihood the jury was exposed. *Id.* at 84. "Doubt about the existence of prejudice should be resolved by proceeding to step two and polling the jurors as a group." *Id.*

¶ 18 Second, if the district court determines that the information has a potential for unfair prejudice, the court must poll the jurors to find out if they have learned of the information. *Id.* In polling the jury, the court may frame its questions in general terms to minimize any implication that information adverse to the defendant exists. *Id.* at 86.

¶ 19 Third, if any jurors were exposed to the information, the court must examine those jurors separately to determine how much they

know of the information and what effect, if any, it has on their ability to decide the case fairly. *Id.* at 83.

¶ 20 The district court's application of this three-step inquiry "must be conducted in the framework of the facts of each case, and the [district] court has broad discretion in deciding the ultimate issue of whether the [extraneous information] prejudiced the defendant's right to a fair trial." *Id.* at 83-84; *see People v. Jacobson*, 2017 CO 28, ¶ 9.

### 2. The Restroom Statements

¶ 21 We discern no abuse of discretion in the district court's handling of Juror H's statements overheard in the restroom. Indeed, the court's handling of the issue was a textbook application of the *Harper* process.

¶ 22 To start, "because the court individually examined each juror, we conclude that the court implicitly found the extraneous [information] had the potential to be prejudicial." *Harrison*, 58 P.3d at 1110. Thus, the district court properly moved on to step two of the *Harper* process and canvassed the jurors to find out if they had been exposed to the potentially prejudicial statements. *See Harper*, 817 P.2d at 84.

9

¶ 23    The court questioned each juror individually[2] in general terms to minimize any implication that information adverse to Vialpando existed. *See id.* at 86. And it gave both parties the option to ask follow-up questions of each juror if they had any concerns that the court's questions did not adequately address. Neither party elected to do so. No juror reported any exposure to extraneous information or prejudgment about the case, whether from Juror H or elsewhere. Accordingly, the district court properly ended its inquiry and did not proceed to step three of the *Harper* process. *See id.* at 84 ("In many cases such a poll may disclose that the jurors did not learn of the [extraneous information], making it unnecessary to question individual jurors.").

¶ 24    And given that none of the jurors were exposed to Juror H's restroom statements, the district court did not abuse its discretion by declining to grant a mistrial on the basis of those statements.

---

[2] Though *Harper v. People*, 817 P.2d 77, 84 (Colo. 1991), suggests that courts should implement step two by "polling the jurors as a group," we discern no abuse of discretion in the district court's decision to exercise extra caution by polling the jurors individually.

### 3. The Hallway Statement

¶ 25   We also do not perceive any abuse of discretion in the district court's handling of the statement — "he did do it" — that Juror H made while being escorted away from the jury room.

¶ 26   Under step one of the *Harper* process, a district court must determine whether the extraneous information has a potential for unfair prejudice by considering, among other things, the likelihood the jury was exposed to the information. *Id.* at 83-84. A court does not abuse its discretion by declining to move on to *Harper* step two and polling the jury if there is no reasonable likelihood that the jury was exposed to the extraneous information. *See Jacobson*, ¶¶ 13-14.

¶ 27   The district court's law clerk reported that, when Juror H made the hallway statement, the door to the jury room was closed, Juror H was not speaking louder than his normal voice, and it was unlikely that the jurors heard anything. Neither party chose to question the law clerk any further or to ask any of the eight jurors who were subsequently questioned about Juror H's restroom statements if they heard the hallway statement. Thus, both parties

11

and the court appeared satisfied with the law clerk's representations and uninterested in any further inquiry.

¶ 28    Moreover, the record demonstrates that there is no reasonable likelihood that the jurors heard the hallway statement.[3]  Eight of the twelve jurors were questioned after the statement was made and were asked, "[Juror H], the juror that has left, did he try to talk to you about this case?"  None of the eight jurors mentioned overhearing Juror H's hallway statement in response to the question.  Consequently, the district court was not obliged to move on to *Harper* step two and make any further inquiry of the jurors regarding the hallway statement.  *See id.*

¶ 29    Accordingly, the court did not abuse its discretion by declining to grant a mistrial on the basis of this statement either.

## B.    Merger

¶ 30    Finally, Vialpando contends, the People concede, and we agree that his conviction for second degree aggravated motor vehicle theft

---

[3] Even if the jury had overheard the statement, we do not see how it would have been seriously prejudicial.  *Cf. People v. Bondurant*, 2012 COA 50, ¶¶ 87-89 (holding that a judicial staff member jokingly telling the jury, "He did it, he did it, he did it," did not establish that the jury was exposed to prejudicial information).

violates double jeopardy principles and therefore must merge into his conviction for first degree aggravated motor vehicle theft.

¶ 31    We "review de novo a defendant's claim that a conviction violates the constitutional protection against double jeopardy." *Whiteaker v. People*, 2024 CO 25, ¶ 9 (quoting *Garcia v. People*, 2023 CO 41, ¶ 13).

¶ 32    The merger doctrine "gives effect to double jeopardy and seeks to protect a defendant from being punished twice for a single criminal act." *People v. Kirby*, 2024 COA 20, ¶ 29.  Under this doctrine, "a defendant may not be convicted of two offenses for the same conduct if the lesser offense is included in the greater." *Page v. People*, 2017 CO 88, ¶ 9; *see* § 18-1-408(1)(a), C.R.S. 2024. "[A]n offense is a lesser included offense of another offense if the elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense." *Reyna-Abarca v. People*, 2017 CO 15, ¶ 64.  If we conclude that such a violation occurred, the remedy is to remand for the lesser offense to be merged into the greater offense.  *See Whiteaker*, ¶¶ 23-24, 28-30.

13

¶ 33    Under the relevant version of the aggravated motor vehicle theft statute, Vialpando committed first degree aggravated motor vehicle theft by "knowingly obtain[ing] or exercis[ing] control over the motor vehicle of another without authorization or by threat or deception" and then using the motor vehicle "in the commission of a crime other than a traffic offense." § 18-4-409(2)(d), C.R.S. 2021. And he committed second degree aggravated motor vehicle theft by "knowingly obtain[ing] or exercis[ing] control over the motor vehicle of another without authorization or by threat or deception." § 18-4-409(4).

¶ 34    Every element of second degree aggravated motor vehicle theft is also an element of first degree aggravated motor vehicle theft. Therefore, second degree aggravated motor vehicle theft is a lesser included offense of first degree aggravated motor vehicle theft. *See Reyna-Abarca*, ¶ 64. Accordingly, Vialpando's conviction for the lesser offense must be merged into his conviction for the greater offense. *See Whiteaker*, ¶¶ 24, 28-30.

### III.    Disposition

¶ 35    Vialpando's conviction and sentence for second degree aggravated motor vehicle theft are vacated and the case is

14

remanded to the district court to correct the mittimus. The

judgment of conviction is affirmed in all other respects.

JUDGE J. JONES and JUDGE BROWN concur.